```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
x                                x      15 CV 04493
x     L. Smith,                  x
x                  Plaintiff,    x
x          v.                    x
x                                x
x     City of New York, New York,x
x     Weill Cornell Medical College x
x           of Cornell University,, x    No. _____ (   )
x     New York Presbyterian Hosp. x
x             Sharon, Hird, M.D., x      Jury Trial Demanded
x          John and Jane Does 1-12, x
x                Defendants.     x
x                                x
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

## COMPLAINT

Filed by:

Louisa Smith
800 Fifth Avenue
New York, NY 10065
212-486-4330

June 8, 2015

Introduction

This is an action under the Federal and State (New York) Constitutions, federal civil rights statutes (Americans with Disabilities Act and Rehabilitation Act ), with pendent state law claims, for the deprivation of liberty and equal protection of law by the City of New York on account of alleged disability and emergency without sufficient cause. In particular, this an action arising out of undue reliance on anonymous "911" calls (and/or other efforts by anonymous persons or persons giving false names or with little or no knowledge) resulting in removal of Plaintiff here, and by the practices employed risking this again and again as to Plaintiff or for that matter, implicating the wider public interest, persons with and without disabilities alike (or with a mere history of disability) , removal from their homes or any other place which might include a place of business. Plaintiff was engaged in a conference call – which was taped as an official record by the presiding participant, a federal official - -at her residence when first responders arrived. She was not engaged in any harmful activity or undue risk to herself (or for that matter certainly not others either). Relying on an anonymous call alone and unable to state any reason to take her into custody, a police officer reported to the federal official who identified herself to the officer and asked his identity and why he was there (and described what the parties had been doing and her impressions and hope to complete the call that had been scheduled and underway for about an hour), police placed Plaintiff in restraints (handcuffs) an undue use of force, while speaking to the person on the phone (cordless, passed through the doorway in an agreement immediately reached to have the police speak with the person who had with many others been on the phone with Plaintiff for

1

more than an hour), and unable to state at the time he announced he was then taking her into "custody" why other than someone had said it was necessary, even though Plaintiff objected it was not and the person on the phone with her told the police similar impressions. Further, any allegation she was harming herself as appeared to have been insinuated would be shown impossible if confirmation of the claims made by Plaintiff and the person with whom she had been speaking (or anyone else who knows her, including physicians, friends, or family) had been attempted. There was insufficient cause for Plaintiff to be taken into custody, resulting in loss of constitutional liberty interests (and actual liberty), and subjecting her further as if by rote (for she was handcuffed as soon as she opened the door almost as soon as police banged on it after she announced she was on the phone and asked what they wanted and struck an agreement to have them speak with the person running the conference call, which was audiotaped entirely – including most of the interaction with police and all of it prior to Plaintiff being taken into custody and prior to her being put into restraints (handcuffs) though she was not violent, threatening, and has no history of violence, and was merely speaking her objection to interference with her conference call and threat of removing her to a hospital). This incident took place on June 7, 2012. Plaintiff was from both reported symptoms and medical tests harmed by undue restraint damaging her physically, and is still suffering from the effects of it on her psychological status and reputation.

  The risk exists that whoever took this action toward Plaintiff could do it again (and may have tried in the past and subsequent to June 7, 2012), to her and to virtually anyone (thus making this action in the public interest to file), without a

sufficient reason and for dubious motives (including retaliation, malice, or even if well-intentioned entirely without understanding of her situation that others not just herself can readily supply if the opportunity is had, so as to avoid unnecessary harm to Plaintiff such as occurred in this incident, exacerbated by the Hospital to which she was taken using improper policies and practices unduly risking and causing harm to persons on account of alleged disability status and not applied to persons without alleged disability status, or history).

On information and belief, there is a great deal of reason to believe that the practices of the Defendant Hospital(s) to which Plaintiff was taken subsequent to the June 7, 2012 interruption of her conference call that day (which call was was audiotaped by the consent and knowledge of those participating and which captured the incidents in this Complaint significantly over a period of about an hour), cause still further harm to persons subjected to removal.  This compounds the damage from improper policies and practices of the City of New York and its urgent response departments (specifically, calls or statements made by anonymous persons concerning other persons with alleged emergency conditions, where the claim of concern is malicious or if well-intentioned nevertheless unfounded, as was the case here, where Plaintiff who has had depression did not need urgent evaluation as all the corroborable circumstances at the time showed and could further have shown had the officers agreed to make that effort rather than discontinue the conference call in which Plaintiff was participating and which was being taped, showing substantially by itself (the tape) that the claims of the caller were unfounded and even impossible.

This action is also an action claiming against the non-municipal defendants that that the policies of the Defendant Hospital to which Plaintiff was subjected without accommodation or waiver ever permitted (as she was informed) are discriminatory on account of alleged disability (on account even, on information and belief, on nothing more than an alleged anonymous call), putting persons removed as above from their homes or any other location and brought to the Defendant Hospital's emergency room at risk of undue harm based on unwarranted stereotyped assumptions and special policies not employed by most hospitals, which policies include for persons alleged as Plaintiff was to be at risk of harm to self, based on a 911 call by an anonymous person, what in law amounts to a strip-search policy and practice, grounded in unwarranted stereotypes about persons with such disabilities (and applied to persons who may not even have such disabilities based on the sole claim or allegation that they do, after which any harm to them from the strip-search itself, which is degrading and invasive and likely to be traumatizing as it was to Plaintiff, is sorted out rather than any accommodations or waiver being permitted, or any physician allowed to be seen prior to the strip-search practice being imposed in any emergency department to which at Defendant Hospital adults with alleged psychiatric disability are taken by city police and ambulance services summoned by the city's urgent response system, even if only based on an anonymous phone call, as here).

As this type of intervention could happen to others and on information and belief it has happened to others though perhaps never with such astonishing circumstances as here (interruption of a conference call held by a federal official, pursuant to advance public notice), and given the incident was instigated on

4

information and belief by a one minute call by an anonymous person (who certainly could not have had her best interests in mind nor understood the circumstances), the action which Plaintiff reluctantly files for multiple reasons including concern to prevent retaliation and also because she was not able to resolve these concerns short of this action as she should have been earlier, is in the public interest.

What happened in the incident described, on June 7, 2012, could in similar manner happen to virtually anyone, given the circumstances of this incident (interruption of a conference call being recorded by the participating parties with their knowledge by police demanding admission to the residence of one of the conference call's participants, i.e., Plaintiff), and further is likely to be particularly damaging if the subject of the 911 call is taken to Defendant Hospital given its use of policies and practices that are substantially different than those at use at most hospitals to process patients brought in by police or presenting themselves for an alleged psychiatric emergency.  Plaintiff also alleges that Defendant hospital has retaliated against her (other Defendants may as well in this action) as a result of her activities challenging the practices she complains about, in her prior work for others as a civil rights lawyer (formerly with the Civil Rights Division of the United States Department of Justice – a section that sues nationally for both (a) hospital violations of disabled people's rights, and sues nationally (b) municipalities for police misconduct).

Plaintiff does not wish to have to be concerned about retaliation after the filing of the Notice of Claim and a subsequent incident involving damage to the door to her residence, allegedly forced open based on an anonymous 911 call but she was not to be found and the door was apparently damaged still further (whether this was retaliatory

5

or a further incident that shows the need for relief to address anonymous calls differently), it is hoped this action will protect against retaliation rather then incur it, particularly with the clarification at the end of this complaint that Plaintiff does not seek to be retributive herself so much as to achieve a win-win type of solution that will not only help her it would help the City and its employees, and the wider public).

Further, Plaintiff, who is not well, would like to be able to discontinue the action voluntarily if her health indicates this would be in her own interests, whether or not another plaintiff steps into her shoes by a separate action or with agreement into this action (as this incident or incidents appears to be one(s) that others in the public risk experiencing, on information and belief).

Finally, Plaintiff does not want to have calls for emergency help to go unresponded to, when made by her or on her behalf, just have stronger indicia of the calls if made being well-founded or, if she is found at home and does not agree that she needs any urgent assistance, that steps be taken to confirm whether this is so rather than relying on an anonymous call or police officers in lieu of clinicians. If she requests help she does want to receive it, including on an emergency basis. Nothing in the complaint is meant to imply anything different. The question is rather about whether and under what conditions persons acting anonymously should be relied upon to instigate a cascade of events that result in an actual misuse of city resources and removal of a person over objection (which is a constitutional level intervention even where a "parens patriae" theory is said to be the reason) resulting in physical, psychological, reputational or other harm to individuals who like Plaintiff in the incident on June 7, 2012 had no need of urgent or emergency care, and indeed was

6

harmed by the incidents that occurred (precipitated as it appears by one anonymous caller, on information and belief), and where there were ways to confirm that Plaintiff did not need to be removed from her home (but the official running the conference call was hung up on by the police officer taking Plaintiff into custody and no effort was made to find other sources of information prior to removing Plaintiff, including use of restraint in the form of handcuffs --- which was denied by the officer to be taking place in his discussion briefly with the person running the conference call, but which in fact occurred as soon as Ms. Smith opened the door to hand the police officer(s) the phone after they reached this seeming step toward resolution short of removing Ms. Smith in any form of restraint.

Retaliation was at issue and resulted when Plaintiff objected to the Hospital (non-municipal) Defendants that their processing of patients was discriminatory based on disability status, and (potentially) by other Defendants subsequent to her filing of her Notice of Claim to preserve the potential for a lawsuit if perceived to be necessary or appropriate with the passage of time and to seek to change systemic practices that on information and belief have been challenged by other litigants previously against the city but (apparently) where those plaintiffs (one or more) sought only money damages.

Plaintiff seeks not only money damages but injunctive and declaratory relief and/or a consent decree agreement (as it should be possible to see that allowing 911 callers who are malicious or even well-intentioned but quite mistaken to disrupt lives and use public services like police and ambulance/fire department, is not a good policy and practice for the city to employ, and police officers should be able to use

7

confirmatory methods to leave the subject of such a call in place without undue fear of personal liability, and refrain from use of undue restraint and force they may be accustomed to using in the context of criminal law enforcement but which as they are not clinicians involves them in decisions that in a very real sense ask too much of police officers while subjecting members of the public, if the system is not changed,to undue risk of loss of constitutional liberty interests and damage to dignity, emotions, possible or actual financial damage, reputational and other damage, including physical harm).

All statements made in this Complaint are made on information and belief, with prior actions believed to contain information that should be useful in resolution here with minimization (even if there is discovery) of costs and time to resolution of this action.

## Jurisdiction and Venue

Jurisdiction arises under 28 U.S.C. § 1331 as this case arises under the Constitution of the United States and federal statutes. Secondarily there are or may be asserted pendent state law claims.

Venue is proper in the Southern District of New York, New York City, County of New York; this municipality and county is where the events at issue in this complaint occurred, and where the parties themselves reside and/or work and/or have principle place of business.

## Parties

1. Plaintiff Louisa Smith is a lawyer by training and experience. She resides at 800 Fifth Avenue, New York, NY 10065. She previously (as noted in the

Introduction) worked for the U.S. Department of Justice in its Civil Rights Division in Washington, DC, in a section thereof where she was responsible among other matters for working on police misconduct investigations, findings letters and lawsuits, and health-care and other institutions' violations of the rights of persons with disabilities. On information and belief this prior work of hers is or may be known to both the police officers who responded in this incident or subsequently, and also to the the non-municipal defendants identified further below.

2. Defendant City of New York, its agencies (and contractors if any private contractors are involved in the incidents in this complaint, not presently known by Plaintiff) who are responsible for responding and who do respond to calls or claims of urgent need for response to medical or other emergencies involving individuals in the public, including its police department and its "emergency services" response system ("911" service), are named as parties. Those agencies which keep records and databases relevant to the claims herein are also likely sub-entities of the city who should be and are essential partners in a modern emergency response team. **The City is primary defendant as it is that which is responsible for its agencies and sub-entities and contractors.** These entities are subject, as state actors, to claims under the Constitution of the United States, and under the Rehabilitation Act and the Americans with Disabilities Act, and not just under pendent state law claims such as the Human Rights Laws of the city and state, or prohibitions on false imprisonment

9

(the latter and indeed all or most of the pendent state law claims being ones that Plaintiff reserves yet may wish to focus on the federal claims).

3. Defendant Weill Cornell Medical College of Cornell University (Defendant "Medical College" or "WCMC"), is a sub-entity or affiliate of Cornell University, a public university in the state of New York (Ithaca as its headquarters; with Ithaca and New York City being centers for the supervision of the Medical College). It has its principal places of business at 445 East 69th Street, New York, New York 10021, and putatively is part of yet at times claims it is a private entity despite being part of the following institution believed to be a public entity (state actor) : Cornell University, with principal place of business care of its administrative and legal offices at 300 CCC Building, Garden Avenue, Ithaca, NY 14853.

4. Cornell University is a state actor. If the Medical College is part of Cornell University, it is also a state actor subject to the Constitution (which apparently it maintains it is not, but the question appears to be a legal one – or one of mixed law and fact).

5. Defendant Medical College apparently maintains it is not a public or state actor. Whether this is true as a matter of law may require elucidation with litigation.

6. Defendant Medical College is subject to the Constitution of the United States if a state actor, and to the ADA and Rehabilitation Act by reason of, inter alia, offering services to the public; its size, and its receipt of federal funding for both research and direct patient health care (through various venues such as its sponsored or controlled physician group practices, and clinical research).

7. Defendant New York Presbyterian Hospital (Defendant "Hospital" or "NYPH") is a private hospital claiming that it is not affiliated with Columbia University.

8. Defendant Hospital (NYPH) maintains its headquarters at 525 East 68th Street, New York, NY 10021.

9. Defendant Hospital's claims about its relationship with Defendant Medical College Cornell University are different (and on information and belief, it acts in concert with Cornell University on many issues of policy and practice as to which it shares joint employees (in significant numbers and with significant job duties), joint insurance, and meets for joint governance discussions.

10. Defendant Hospital is subject to the ADA and the Rehabilitation Act, as a private entity of a certain size that inter alia, offers services to the public and receives federal funds for various purposes including patient health care.

11. Defendant Hospital "G" is intended to refer (if necessary in this action) to Gracie Square Hospital, a hospital on the Upper East Side of Manhattan, East 70th -71 Streets, in New York City, New York County, New York, NY 10021. It is unknown by Plaintiff at this time if this hospital is controlled or owned by Defendant NYPH, but it appears to take patients directly in lieu of referral to Defendant NYPH's inpatient psychiatric and Westchester Campus affiliates or subordinates.

12. Defendant Sharon Hird is named in primarily a representative capacity but if it is found that she has acted in a retaliatory manner, or unreasonably and discriminatorily, action against her as an individual would be appropriate and is reserved. This physician despite years of work as a physician appears to

11

harbor retaliatory animus toward Plaintiff personally for her complaints about the discriminatory nature (expressed as Plaintiff as her view of the law applicable) presented by processing of a sub-set of patients defined by disability or alleged disability (as in the June 7, 2012 incident) where the Defendant Hospital's policy requires of all persons with a certain type of disability or alleged disability, the removal of all clothing including underwear within view of a non-medical staff member as in this incident. This practice is a matter of routine policy for persons alleged to present a danger to themselves or others or to be subject to psychiatric disability, but not to persons who are not so considered by the Hospital defendant who are exempted from this policy and practice or it was not designed for any such persons without disability.

13. The other John and Jane Does are intended to refer to (potentially, and likely in a representative capacity though without prejudice to claims of intentional misconduct): (a) police officers involved in the incident of June 7, 2012 and police officers who may subsequently have retaliated against Ms. Smith; (b) emergency medical technicians; (c) two or more physicians in addition to Dr. Hird employed by or working in the emergency department at the Defendant Hospital on June 7-8, 2012 as colleagues or with respect to two who changed Dr. Hird's stated recommendations and disposition after it was rendered nearly 36 years after Ms. Smith arrived in the emergency department and all efforts to contact those on the conference call (see introduction and facts section) were refused by hospital staff. These two junior doctors acting together deprived Ms. Smith of legally required options under New York law to choose or participate

in disposition and changed the recommendation to have her referred. She was at the election of these two junior doctors sent to another facility, with no effort made to confirm her claims about what she had been doing other than to claim that her balcony could not be seen on "google maps" (and all offers of permission to speak to the person running the conference call were declined by staff). That meant she would arrive at 2 to 4 a.m. on a Saturday, ensuring that at the referred facility she would not be assessed and discharged (as she was almost immediately upon actual assessment, after informing her that she had sustained damage to muscle that could be attributed to the handcuffing). This list of John and Jane Does further includes (d) the physician and nurse staff who elected improper sedation when Ms Smith did not wish to undress and remove underwear in view of male non-medical staff; chose a medication they should know is contraindicated; and ignored or did not follow up with claims of cardiological symptoms other than to provide a single tablet of aspirin.

14. As to the police officers involved not named here in this complaint as yet: To the extent the police officers involved acted outside their received training Ms. Smith reserves claims of improper use of force and restraint and false imprisonment and constitutional and human rights violations (*though she expects they believed they were acting inside the scope of their employment and the problem is instead a systemic one; discovery should reveal which but the incident is indicative of the need for relief in the form of back-up for officers themselves, not necessarily a punitive response as this Complaint intends to make clear Plaintiff understands may be the case*). Finally, if anyone at the

13

transfer facility acted in bad faith, to perpetuate the problems outlined in this Complaint and at issue in this action against not only the Municipal Defendants but the Corporate Defendants (distinguished from the municipal by terming them such), they claims should be considered reserved against them as Jane and John Does as well, although those personnel met by Plaintiff at this transfer facility appeared to act without knowledge of the full circumstances at a time of day and non-business days when they (the transfer facility) received her on a weekend in the middle of the night, and released Ms. Smith immediately after their own separate assessment at the beginning of the following business week.

Factual Allegations

15. On June 7, 2012, Plaintiff Louisa Smith was expected to participate in a conference call in connection with legal claims. Ms. Smith is a lawyer (as noted above in the "Parties" Section of the Complaint.
16. Other parties placed the call as ordered, which was then joined by an individual who presided and who recorded the call (with consent of all parties). The conference call was commenced by other parties calling Ms. Smith at or around 10 a.m., which was the time scheduled for the conference call.
17. The presiding party then joined the call, and commenced recording the proceedings.
18. This recording by the presiding party and as is legal under New York law for calls inside New York, extended for over one hour.
19. The recording was made available for sale to anyone who wanted to purchase it.
20. The recording was also made into a transcript (written version).
21. Plaintiff used a landline with a hands-free cordless phone during the call.
22. Plaintiff was called at her residence, where she had then lived for more than 11 eleven years, and which at all times she resided in her apartment has had a

balcony or terrace, semi-circular in shape, with a brick well approximately three to four feet high, and above that a set of metal railings making the balcony wall (or barrier to going over the balcony wall) still higher by approximately one foot.

23. The weather was clear and sunny, and warm in June 7, 2012.
24. The night before the call, Plaintiff spoke to someone who is in her building often about her intent to put plants on her balcony. He made a record of his impressions for he expressed dismay when he returned from vacation to learn that Plaintiff had been removed from her residence the next morning in the manner recounted herein, visible to a significant number of people.
25. Plaintiff Ms. Smith's telephone changed in phone quality during the call for a few seconds and she was asked about this.
26. Plaintiff responded that she had stepped outside given the weather, and had muted the phone while she opened the door leading thereto.
27. The conference call continued for at least an hour, with no unusual sounds from any party and no other muted seconds. The muted seconds were, on information and belief, subject to recording by one or more parties to the call, such that there is no loss of sound in the full records of the audiotapes and written transcripts together.
28. After about an hour, Plaintiff saw police cars and heard sirens on a side street her balcony/terrace overlooks. She was curious but not bothered. No one on the call commented if they heard the noise (they did not ask her to go inside or complain, which she had asked earlier after asking about the phone quality which in her building and with her phone is often improved on her balcony, or near a window).
29. Soon after however, Ms. Smith noted persons pointing from the street and gathering in a group.
30. Almost immediately afterward, there was a loud banging audible to Ms. Smith and apparently to all on the conference call.
31. The presiding person advised Plaintiff to go back inside and answer the door; this was acceptable if it had nevertheless been hoped that the call would soon be

15

wrapped up because the presiding party had another call or responsibility scheduled shortly.

32. Ms. Smith heard police announcing their presence and demanding admission and that she open the door.
33. Ms. Smith had just in light of the sirens and banging begun to become very emotional and expressed astonishment and even wondered aloud if someone on the call had phoned for intervention (to cause the premature end of the call or to otherwise).
34. The presiding person said she and no one in her office or acting on their behalf of at their behest had caused the police to show up and expressed surprise herself.
35. The presiding person agreed to speak to police on information and belief in hopes of continuing the conference call and completing it, as well as to assuage Plaintiff Ms. Smith's fears and concerns.
36. An agreement was made after Plaintiff informed the police who said they would break her door down (in response to which threat she told them they very nearly would be breaking her door, were damaging it, and asked them to stop banging on it).
37. The agreement reached was the phone would be passed out (cordless phone) and Plaintiff would open the door and pass the phone to an officer.
38. The presiding or most senior police officer, a detective on information and belief, took the phone.
39. As soon as she released the phone from her hands, Plaintiff asked when she saw handcuffs to not be handcuffed, but she was handcuffed despite putting up no resistance other than to ask to discuss with the person on the phone advocating that she not be removed from her home and to clear up the situation after learning what was going on.
40. The police said they were not handcuffing Plaintiff but they did and records exist to corroborate that they did so, and she arrived at the Defendant Hospital

16

in handcuffs, having been in that form of restraint in the ambulance during transport.

41. The officer who spoke to the presiding conference call participant was asked by such person WHY he was there.
42. The officer had had the conference call participant identified and she identified herself and role (generally).
43. The officer gave his name to the presiding conference call participant with whom he was speaking but he could not answer why Ms. Smith was being taken into custody precisely.
44. The officer stated she was "in custody" (his and the police department's parens patriae custody, it was made clear), because of unspecified claims by an unidentified person that Plaintiff was at risk of harming herself, but he did not say how precisely.
45. The officer hung up on the presiding party instead of asking to confirm who she said she was and call her back, or for any other information. She had told him that she was aware Plaintiff had a history of depression, was depressed, but that she also knew Plaintiff was on her balcony during virtually the entire call and that it had been more than an hour and Ms. Smith did not seem to be harming herself (in sum and substance).
46. The audiotape is inconsistent with any activity by Ms. Smith to harm herself. She was cogent, participated and was not heard to exert herself in any way, as would be required if, as was later suggested, she had been climbing as she would have had to do in order to try to go of her balcony or out a window (suggestions made later particularly at the Defendant Hospital which already had reason for animus toward her or retaliatory motivation and risk management/litigation concern).
47. Someone on the conference call other than the presiding person and Ms. Smith herself offered to call the hospital to announce she was arriving.
48. It is unknown whether they did make any such call.

17

49. Plaintiff was taken from her apartment, with only a sundress and underpants on, and with a staff member working in the building having gotten her insurance card and a photo ID out of her purse and a pair of sandals.
50. Plaintiff was denied any other possessions to take with her (no keys, no money, no eyeglasses or extra contact lenses which she wears, nothing else but what she was wearing and the items referenced in the foregoing paragraph.
51. Plaintiff was paraded in front of many people on the way out of the building, placed on a medical gurney but in restraints.
52. This visibility (parade) was embarrassing and upsetting to Ms. Smith, as on information and belief it would be to anyone.
53. Plaintiff complained of cardiological symptoms, difficulty breathing, and undue tightness of the handcuffs. No relief was offered (one police officer was with her in the ambulance to unlock the handcuffs and turn her over to hospital personnel then leave, which is what he did; the other personnel were on information and belief EMTs who did not render any medical assistance but told her to wait. She asked where she was going and was told Defendant Hospital.
54. Ms. Smith did not offer any physical resistance.
55. Ms. Smith had been verbally respectful throughout her interactions with police and EMTs, and attempted to joke with the officer in the ambulance, pleading also for water and to be released from handcuffs.
56. On arrival Plaintiff was released to custody of the security personnel in the hospital based on the allegations of the anonymous caller.
57. Based on the manner in which she arrived at the hospital and the allegations made by an anonymous caller, Plaintiff was subjected to the Defendant Hospital's mandatory disrobement policy and practice, which includes underwear removal.
58. Plaintiff was told by security staff (male) that she could stand in a toilet area with the door open while she removed her clothing. The door had to be open so that a security officer could watch her.
59. Only male security staff were in the emergency department.

18

60. Ms. Smith refused and was permitted to sit in a chair.
61. Then a female security officer appeared, took her into a cubicle with windows and with other staff crowding in, and stripped her naked including removing her underwear. This officer had hair apparently dyed blonde, was Caucasian and about the same height as Ms. Smith but larger in build.
62. There was no need for Ms. Smith to be subjected to this degrading procedure.
63. Due to her objection to being in the emergency room and to the demand she undress in sight first of a male security officer and for that matter at all though no one asked her about the sex of the officer bothering her or not, she was then injected with a sedating drug that, on information and belief, is medically contraindicated for persons with heart rhythm or other cardiological conditions.
64. Ms Smith was not given the same medical care that someone complaining as she did of cardiological symptoms and later a pounding headache would be if regarded as a person with credibility and worthy of respect.
65. Ms. Smith was given one tablet of aspirin for the cardiological symptoms and no testing was requested to be performed (though this hospital was informed and of her heart rhythm differences and exacerbation resulting in low or high rates compared to most other persons).
66. Ms. Smith was kept for ultimately 36 to 38 hours in the emergency department.
67. Plaintiff was interviewed multiple times but largely left alone. She consistently asked to leave and asked that they go ahead and call the presiding person on the conference call. They did not agree to make this call.
68. Plaintiff Ms Smith called the presiding person and told her staff where she was and that the conference call would not be able to be finished that day.
69. The next day was a Friday, and Ms. Smith was kept until at least 8:30 p.m. after being told that her claims of what the evidence about her apartment and activities that day would show, if only explored, were rejected, as were her own representations.