70. Ms. Smith met Sharon Hird, M.D., who had knowledge of Ms. Smith or claimed it.  Dr. Hird heard of Ms. Smith's objections to the disrobement/nudity requirement.

71. Ms. Smith was allowed to make a few phone calls but only overheard by security staff.  This ruled out meaningful conversations with anyone acting in the capacity as legal counsel.

72. Ms. Smith was told by Dr. Hird that Dr. Hird could not confirm her claims about the nature of her balcony, unable to see it on "google maps," and thus would have to send her for further holding to ensure her "safety."

73. The foregoing conclusion was not merely medically unreasonable, it was retaliatory and discriminatory (the latter for not crediting Ms. Smith's account nor even attempting to confirm it by the most obvious means; the former because on information and belief Dr. Hird is one of the architects of chief proponents of the mandatory stripsearch policy and practice Ms Smith claims is illegal under federal law and had told Dr. Hird and others at Defendant Hospital, including risk management and legal personnel who were well aware of her background as a Justice Department lawyer).

74. After Dr. Hird said she would not be turned away though she objected to the Hospital's policies, but would be required to be watched longer than the 34 or so hours she already had been in the emergency department, on a Friday evening by this point, Dr. Hird said she would be sent to a bed in the hospital or its associated Westchester campus.

75. After Dr. Hird left, two junior resident physicians determined instead to send Ms. Smith elsewhere, after laughing about her complaints and discussing them, and teasing her.

76. Transfer personnel said she did not seem to be the sort of patient who should be sent or was normally seen to be sent to the location they were told to take her,

77. She actually was not processed at that facility or location, which is either owned by Defendant Hospital or under its control or dependent largely upon it

for patients (as it had no emergency room of its own, on information and belief) until 2 a.m. on Saturday, June 9, 2012.

78. At that time of day and weekend, facilities of the sort in question do not discharge patients they have never met (or in fact any patients on weekends or in the middle of the night).]

79. Ms. Smith was required to stay in this location near Defendant Hospital (just a block or so away from the emergency room of Defendant Hospital), over the weekend.

80. Blood tests she no longer felt she could refuse were done, and the results were abnormal and redrawn.  They were abnormal again.

81. Ms. Smith was asked if she had been put into tight restraints.

82. Ms. Smith was told to drink a great deal of water and told that her blood tests were consistent with muscle damage of some sort that could damage her kidneys so she should drink a lot of water.

83. Ms. Smith was met by a team of professionals on Monday, June 10, 2012 and a decision was made shortly thereafter *to discharge her*.  She was allegedly not known to them (and had never met them herself before).  (They were all unknown to one another.)

84. Ms. Smith found the entire recounted at each facility (the last not being bad to her but being unknown and frightening and as she had been told not a place where patients like her ordinarily were taken, and on information and belief this was a retaliatory disposition by Defendant Hospital, as it was unnecessary and Ms. Smith had never been transferred to a psychiatric bed by Defendant Hospital before, though she had been seen by the Defendant Hospital (NYPH) on previous occasions.

85. Plaintiff had a relative come and friends attend her and took months to recuperate – the damage to her physical health directly and from psychological stress and retraumatization was extreme, and soon she was unable to consume food for many days at a time.  She had trouble sleeping, was fearful, and avoided her balcony and all windows (which she continues to do, unfortunate

and a loss of use of the apartment, in one of the more minor yet also telling results of this experience, because the views from the apartment unlike all prior she occupied are one of its finer features – views being an unusual privilege for which she has had to pay a premium).   Ms. Smith also feels embarrassment around people who reside in and work in the building.   Most important she is fearful, ruminates about the disrobement and threats of retaining her longer for complaints about the disrobement practice and policy of the Defendant Hospital (and on information and belief, a practice and policy supported by the Defendants Medical College with at a minimum awareness and apparently some form of explicit or tacit approval, and staff who serve on the joint boards governing coordination of each corporate (non-municipal) Defendant).

86. Subsequent to the incidents recounted herein, Ms. Smith's apartment was visited by police, according to reports left for her and other information (giving her information and belief), but she was not found at home after they forced (she is told) her door open.

87. Ms. Smith was given to understand that police alleged that the forcing of her door was due to an alleged emergency – a call allegedly for "help" for her made by apparently by a 911 anonymous caller (again).

88. There is some evidence that the door was more loudly damaged (if not actually more damaged altogether) upon the exit of the police from the apartment on the evening in question, rather than when they (she was informed) forced it open to try putatively to "help."   Whether this was in fact necessary or retaliatory as it followed the timely filing of a Notice of Claim by Ms. Smith on or about Sept. 4, 2012 may be a matter likely for a finder of fact after more discovery.

## Legal Claims

89. This is an action under the Federal and State (New York) Constitutions, federal civil rights statutes (Americans with Disabilities Act and Rehabilitation Act – both those that require accommodations in law enforcement and other activities by the city and in health care and other activities by the corporate defendants,

**and** non-discrimination and refraining from retaliation – viz the statutes prohibit retaliation particularly for complaints of discrimination as made here in the Notice of Claim and as against the corporate defendants in multiple ways and yet never a pleading containing this incident for reasons not legally appropriate to discourage.

90. Plaintiff makes federal Constitutional claims under the First and Fourteenth amendments thereto and other provisions thereof, and caselaw, including prior cases finding that responses by New York City to anonymous callers even in the case of someone mentally ill or with an extremely untidy apartment are insufficient as a basis to restrict constitutional liberty interests in being free and not being forced to go to a hospital emergency department over objection of the party so transferred, whether in physical restraint or not.

91. The use of physical restraint here by the police was particularly inappropriate and unnecessary and whether it reflects errors in training or otherwise, the use of handcuffs or any restraint was unnecessary to protect Plaintiff or anyone else.

92. Ms. Smith has never been violent or physically threatening to anyone.

93. Ms. Smith is verbally argumentative but rarely if ever even uses an expletive or profanity and used little to none in the circumstances recounted here (and at most in the NYPH emergency room after she was had been forcibly and unnecessarily entirely denuded in front of several people of male and female genders, told she would not leave, and was taunted, denied access to the phone, unnecessarily sedated, her physical complaints not responded to other than

with an aspirin tablet, and otherwise improperly treated in the NYPH

emergency room, on information and belief because of her being viewed as a

litigation risk and threat.   That risk is not cause to retaliate against a patient.

94. The ADA and Rehabilitation act are federal statutes that have been read alike

in each context – public (state/municipal) entities and private entities – with

legal limitations and requirements in this manner).

95. Plaintiff makes claims under the State Constitution of New York, for violation

of its equal protection and related provisions.

96. Plaintiff also makes pendent state law claims (including under the State and

City Human Rights Laws, and law prohibiting or making illegal false

imprisonment (unprivileged restriction of liberty), and medical malpractice and

negligent supervision and training (as against all Defendants other than those

who do not supervise others or who have not been properly trained due to

failures by those above them in the defendants both municipal and private or

state).

97. , for the deprivation of liberty and equal protection of law on account of alleged

disability and emergency without sufficient cause (and particularly for reliance

on anonymous "911" calls or other efforts by anonymous persons or persons

giving false names or with little or no knowledge) resulting in removal of

persons with and without disabilities alike (and with history of disability) from

their homes, often with use of undue restraint and force not merely without due

cause, as occurred to Plaintiff, on June 7, 2012 in an incident described herein,

when one officer of the New York City Police Department announced she was

being taken into custody after interruption of a conference call during which an anonymous party called and claimed she should be removed from her residence for alleged psychiatric emergency or danger to self.

98. Plaintiff was then further subjected to a set of discriminatory policies and practices at the Defendant New York Presbyterian Hospital, which employs particularly degrading policies and practices (into maintenance and employment of which the Defendant Weill Cornell Medical College of Cornell University has input and knowledge) requiring of patients brought in over their objection for any evaluation in any emergency room if identified as a "psychiatric" case as plaintiff was in this incident, but not if the identification of the patient leaves out any allegation of past or current psychiatric disability, and which discrimination (based on alleged, perceived, actual, or known or alleged historical psychiatric disability) includes a practice that amounts to a "strip search" procedure (as that procedure is defined in law) applied for unwarranted stereotypes and assumptions about persons alleged to have a psychiatric disabling condition.  The patient so identified by disability status is, whether seen in the regular adult emergency department or a psychiatric adult emergency department, subjected to a requirement to remove underwear and all clothing and jewelry in view or viewable (as that policy was imposed on Plaintiff in the incident here) by non-medical staff prior to seeing or speaking with medical staff particularly doctors and no accommodations are made whatever nor is there any waiver offered to patients alleged even by merely a 911 anonymous caller to be an immediate danger to themselves (as apparently

occurred here on June 7, 2012).  This policy and practice risks undue physical and emotional injury including traumatization, and degrades patients on account of alleged disability status (or history).

99. The policy and practice rests on assumptions that are unwarranted stereotypes about persons with psychiatric disabilities, and is in that sense doubly discriminatory.

100.    Plaintiff suffered unreasonable and undue loss of liberty and a variety of forms of serious harm as a result of the incidents precipitated but that should not under the circumstances been credited, by an anonymous caller to 911 services, or other emergency reporting method, and the removal of Plaintiff from a conference call in which she was engaged in her residence (that was being recorded with the knowledge and consent of all the participants), with the officer (on information and belief a detective-level police officer) taking her into custody in her residence after speaking with the person running the conference call and hearing that the call had been ongoing for about an hour and that despite a history of depression the Plaintiff was not believed to be doing anything untoward or unsafe during the call, and that the hope was to finish the call.

101.    The police officer was asked why she was being taken into custody and could not state why, just that someone had said it was necessary, and hung up the phone on the person with whom he had been speaking rather than even try to confirm her identity.

26

102.    The officer refused to allow Plaintiff to confirm through other means (doctors, etc. to be reached by phone if he wished), that she was not believed to need to be hospitalized or seen and there was no emergency.

103.    Plaintiff had been handcuffed as soon as she had agreed to open the door to hand her cordless phone to the police banging on her door and demanding to be let inside. This was unnecessary force and restraint. It was also deeply degrading as was the removal in view of a great number of people.

104.

Plaintiff was then at the Hospital facility retaliated against for her objection and litigation threat (and perceived strength of her assessment as a known former civil rights lawyer in the U.S. Justice Department lawyer with knowledge of applicable laws) to their policy of requiring her to remove all her garments including underwear in view of staff of Defendant Hospital and Defendant Medical College (both, on information and belief), prior to seeing a physician.

Plaintiff was also putatively disbelieved when she reported accurately as to what she had been doing when taken into custody (even if parens patriae in alleged purpose, still a loss of constitutionally protected liberty interests) and just before. On information and belief the claimed disbelief of her statements was on account of discriminatory bias and/or retaliation (her claims of what she had been doing when the interruption occurred with arrival of emergency personnel and police at her residence and their restraining her and removing her to the Defendant Hospital as being the one closest of identified as being in a catchment area close by her residence). In a further retaliatory move by Defendant New York Presbyterian Hospital, she was

kept in the emergency department for 36 to 38 hours, and then instead of being

released, based on an allegation that her claim she was not doing anything unusual

during the call (in which she was standing on her terrace and this was known to all

participants), and an alleged inability by the hospital doctor to see her balcony on

"google maps" satellite function, she was disbelieved in the first instance and sent for

further evaluation (which was at first identified as being at the Defendant Hospital's

own bed then she was instead placed elsewhere on information and belief to still

further lengthen the time she would lose liberty because the other facility did not

know her and would not receive her until between 2 and 4 a.m., on a weekend,

ensuring in effect that they would take days to evaluate her and her claims as they

had no knowledge whatever and had been told inaccurately by the Defendant Hospital

that Plaintiff had presented a danger to herself, which at the time of the incident was

most certainly documented as untrue and the allegations later stated were literally

physically impossible under the circumstances of the conference call in which Ms.

Smith participated and from where (and how, with what demeanor and activity) she

participated in it.   The allegations were also inconsistent with statements she had

just made the previous evening to someone in her residential building.

Indeed astonishing is that Plaintiff, who is a lawyer, was in the midst of a

conference call, when the conference was interrupted.

Plaintiff has had depressive conditions (so labeled) twice in her life, in fact

disabling her, but did not as a result of any mental illness or other medical condition

require emergency evaluation nor was there any reason whatever to credit the

anonymous caller – whose call on information and belief was little more than a minute

in length and from a location where the person could not possibly have seen any activity on the Plaintiff's balcony or terrace, and at any rate the wall is so high Ms. Smith could not have been doing anything other than participating in a the conference call as she was, with the phone in her hand at all times and no heavy breath, without harm to anyone including herself (and there is an imminence of harm requirement prior to taking someone into custody and depriving him or her of liberty, a loss of freedom with constitutional implications and violating constitutional rights).

<u>Notice of Claim Was Filed</u>

1. On or about Sept. 4, 2012, Plaintiff Louisa Smith filed a notice of claim as to the incident dated June 7, 2012, involving in the City of New York, its police department, and its emergency response system more generally.

2. Louisa Smith timely filed a Notice of Claim (within 90 days of the incident in question that commenced on June 7, 2012) filing papers with both (a) the City's Comptroller's Office  and with (b) the City's Corporation Counsel's office on the same date as the filing with the Comptroller's office; with each supplying a cover letter.

3. The claims made herein are timely under applicable federal law, and to the extent any state law claim is subject to a shorter timeline or incidents subsequent (and possibly any preceding),  the notice of claim also should be considered timely by relation of the incidents if established after discovery (i.e., if they are in fact related, as some do appear to be, though Plaintiff has identified where she has relied on reports rather than first-hand experience).

## Special Considerations
## (Factual and Legal Considerations Overlapping and Meriting Special Attention)

The loss of liberty involved by police taking a person into custody for "parens patriae" purposes is a constitutionally protected liberty interest that is of the most significant form that can be limited by state actors.   This significant decision and intervention should not be made lightly or on the insistence of an anonymous caller (or even someone who will self-identify if there are other countervailing circumstance and evidence), even with a person who has a history of a mental illness or a current mental illness (for these do not mean that the person is in need of urgent or emergency care or intervention).

Plaintiff is not arguing in this Complaint or seeking by filing it to have no response to legitimate emergency calls made by her or on her behalf; only that these calls be responded to when there is better indication that the call has a good basis and is NOT based on an anonymous call where she herself does not wish to have treatment and could if permitted present medical confirmation and/or connections to doctors to confirm her status medically known to them, OR where as here a corroborating person was telling officers that she had been speaking with Ms. Smith for an hour or more and indicated her belief there was no cause for concern, and was hung up on rather than called back or, if her own statements were not considered sufficient, Ms. Smith was not allowed to seek additional sources of support and proof that she did not need much less want any transport to hospital at the time of this incident (June 7, 2012) and/or is confirmed to have been made by her (on her own behalf; if confirmed that she

herself has made the call for help, she has no history of making undue use of emergency rooms or undue use of hospital treatment), particularly when she denies wanting any care and particularly where as here someone else testifies to having just been speaking with her, and the other circumstances are all inconsistent with the claim of any urgent demise or risk of demise by Plaintiff (who is also clearly no harm to anyone else, now or at any time in the past, and e.g., as her FBI background clearance reports show for employment for a sensitive position at USDOJ, which she left for personal reasons to join private firm in New York having worked in Washington DC for a period of time, and as she, e.g., has never been so much as arrested for civil disobedience or any other reason).

Furthermore, to place this heavy duty of becoming in effect clinicians officers is a great burden when their primary duty is law enforcement in the criminal law context.

Police officers should not have to be all things to all persons.  Police officers should not necessarily be asked to triage persons with allege mental illness as to whether there is a disability or either way, any emergency actually making it appropriate to limit the constitutional rights of an individual and remove him or her to a hospital (emergency room or other hospital facility).  This heavy responsibility should not be one borne by police alone based on nothing but a 911 call, which may be made by a person with malicious motives, as a prank or to cause harm (stigma, loss of time and money, reputational harm or reconsideration, prevention of completion of tasks and responsibilities the person may have, undue concern to neighbors as to whether the subject is ill or accused of a crime).  Alternatively, even a well-

intentioned caller may be mistaken and to remove a subject of a 911 caller to hospital is uncalled for (just as police themselves are not clinicians and should not be required to become such, though possibly some element of injunctive or consent decree relief might employ clinicians to respond to such calls, and to help determine whether to leave the subject of the call in his or her home).

Moreover, the number of calls made about a person having been more than one (e.g., given the subsequent incident in which Plaintiff was not found at home but allegedly entry was had to her home because an anonymous caller alleged she was in danger and needed urgent help). The same caller, if making a practice of such calls, should be discouraged (where such calls on information and belief are traced in some respect, even if someone may utilize multiple phones or phones not registered to him or her, a pattern may be obvious, and if so may even be a target for an injunction against him or her any such further calls).

Plaintiff's intention is not to seek primarily (or even necessarily at all) relief from individual persons, qua individuals in particular.

Claims of individual responsibility are realistic here if the facts show intentional bias, or sufficient reason to believe there was not just force but retaliation, *or failure* to follow any decent, constitutionally and otherwise legally acceptable policies and practices.

Police officers should not retaliate, including more specifically here for such things as the filing of the Notice of Claim, or for insistence on being permitted to file complaints or asking questions and objecting to how she was treated at times, or for evidence prominent publicly available and in her residence showing that Ms. Smith

32

does or did work previously at the U.S. Department of Justice's Civil Rights Division in a section responsible in part with other sections for investigating and pursuing claims of police misconduct (with several prominent consent decrees obtained from and by that section of the Justice Department), whether or not they knew if she did work on those consent decrees or believed she may have done so or did not like that she elected to work in a section that did such work (even if her own work might turn out to have had other topical focus).

One of the reasons for filing this Complaint, which Plaintiff has decided to do for a variety of reasons having been concerned about retaliation, is to prevent further retaliation or to have others take seriously that retaliation may be the cause of any harm to her or her property (such as described above and alleged to be necessary to get in to her apartment when she was not found at home to answer the door and let anyone in, but where there is evidence that the main damage to the door was done after the officers left the apartment after searching for her in the apartment, which also implicates improper reasons for remaining in her apartment or even entering it to begin with, potentially (this possibility should be incorporated as one of the issues for discovery, or potential discovery in this action, and not solely the initial incident involving the City as to which a Notice of Claim was ultimately filed timely, preserving the federal claims under the usual statutes of limitations (and for the federal claims all are timely by the straightforward application of law, while as to other claims with shorter statutes of limitations concepts of equity, just as with subsequent incidents sufficiently related to the incidents of June 7, 2012, should arguably also be considered timely under the statutes of limitations, or equitable

principles of sufficient notice and relation back and relation forward of claims and amendments).

Even with training, which might be made more extensive and improved, as with other jurisdictions New York might well, particularly given crime and perhaps higher risk as a target for the particular form of security concern that is constituted by terrorism and the threat thereof (experienced so horribly in New York City on 9/11/01), **police officers in New York in particular as in other municipalities should have the resources of specialists when asked to respond to a "911" call** which should be expected **to reduce costs (overall) and undue interference with citizens and non-citizens acting in a lawful manner.**

Police officers may it appears also need more training on *when they do and do not have a reasonable concern about personal liability* -- which it should be noted many officers do appear to have, even though that concern is perhaps less serious than many officers should have (but alas do appear to have) if acting in good faith in connection with what they reasonably understand to be their jobs based on the training and supervision they have at the time (among other considerations).   The concern for personal liability may, if over-concern exists, result in undue interference with citizens in the context of incidents like that recounted on June 7, 2012, paradoxically.

The injunctive relief (or declaratory relief or consent decree suggested) as part of relief in this legal action, should involve serious consideration involving all or as many as possible stakeholders as is reasonable and workable.

Harm

As a result of the city's response to the 6/7/12 anonymous call and the

Defendant Hospital's conduct. Ms. Smith has sustained damages as described above,

and is fearful, rarely goes out, and the harm above and here has contributing to her

being is unable to recover her former full functioning, and worsening of a trauma

disorder and depression.

Relief Requested

On information and belief, the practices of both the Hospital and Medical

College Defendants and the City of New York (and its agencies and sub-entities and

contractors who are involved in the incidents and records of same), are ongoing.   In

particular, the strip search policy of the Defendant Hospital and Medical College

applied on account of perceived alleged  actual or historical mental disability continues

to apply to any person brought to the Hospital Defendant for any form of medical

treatment, and particularly though not exclusively in its emergency rooms (adult

regular, and psychiatric emergency rooms in particular though not necessarily

exclusively), and with a similar but less codified practice in use as applied to persons

on account of perceived, alleged, historical or actual mental disability hospitalized as

in-patients in its regular medical-surgical wards, and (on information and belief, for

Plaintiff has not been hospitalized as an in-patient in psychiatric wards operated by

Defendant Hospital or any entity owned by it, to her knowledge, yet on information

and belief considers that the same or analogous (similar) police and practice

permitting spot-check strip-searches applies in Defendant Hospital's own psychiatric

wards (such that if she had been transferred to one, in medical error or otherwise, she

would be and is at risk of being subjected to the strip-search policy and practice on such wards operated by Defendant Hospital).

<u>Declaratory and Injunctive Relief</u>:

In light of ongoing risk of the same kind of incident recounted in this complaint, Plaintiff seeks:

An order or consent decree directed to the City of New York and its agencies and sub-entities and contractors with any involvement:  declaratory and injunctive relief to allow for transfers in true emergencies, but to curtail improper transfers by setting in place a system to ensure the appropriateness of transfers without relying only a single "911" call by an anonymous source and without any further effort to confirm actual necessity for transfer (particularly over the objection of the Plaintiff); and to protect against undue force and excessive force, among other relief that should be evaluated as part of the litigation and take into account procedures utilized with some success to ensure that officers are not unduly fearful of personal liability for leaving an individual in place after confirmatory steps, and/or to supply specialists to assist in making such determinations without undue fear of personal liability – without of course ruling out liability for conduct that is excessive and unjustifiable by individual officers and/or persons retained to assist them as part of a process to ensure that persons do not lose constitutional liberty where this is the result of improper effort to have the subject (here, the Plaintiff in the action) removed whether from malicious motivation or well-intentioned but mistaken motivation (because mental illness alone does not constitute an emergency).  Thus, consistent with those purposes

and other reasonable concerns raised by the serious ongoing risk of loss of liberty and undue force with damage to Plaintiff:

(1) and order providing injunctive and declaratory relief, that inter alia finds that the City and the Defendant Hospital and Medical College violate not merely state law but Federal Constitutional law (Fifteenth and Fourth Amendments included), and the following federal statutes: the  Americans with Disabilities Act, and the Rehabilitation Act, and that further would  to provide as injunctive and declaratory relief as part of the order to prevent such violations going forward as to Plaintiff and in the public interest (it being wasteful of public resources otherwise, and not solely a question of harm to Plaintiff herself or others similarly treated on account of alleged actual perceived or historical mental/psychiatric disability):: potential appointment of a special master or committee to ensure that in the public interest as well as Plaintiff's own, resources are not misused and are however properly used (so that she may receive emergency care when appropriate but not be subjected to it over her objection when not confirmed to be appropriate with sufficient sources), and that the first and second forms of declaratory and injunctive relief may also appropriately include the Hospital Defendant and Medical College Defendant (or others to be identified), to ensure that bias as to rationale for transfer does not result either in strip-searches or disbelief (lack of crediting and confirmation) of the claims of the Plaintiff as to what she was doing or the lay-out of her own abode at the time of transfer and alleged emergency as occurred and she was not credited when she was transferred though she had been engaged in a recorded and later transcribed official court conference at the time of the arrival and intervention by police and emergency services personnel, and

during the apparent time of the telephone call to "911" by a person who gave no full

name and whose alleged or claimed reason for 911 (emergency services and/or police)

to dispatch police and an ambulance (and any other city personnel) to the residence of

the Plaintiff; and (2) declaratory and injunctive relief directed to the Defendant

Hospital and Medical College to require either or both as sufficient to ensure they

cease and desist from requiring disrobement on a alleged claim that the person in

question has a psychiatric or other mental disability -- as to Plaintiff and any other

person on account of such disability (alleged perceive actual or historical) brought to

their psychiatric emergency room (or any other location where the person is subjected

to disrobement fully including underwear, prior to seeing a physician for evaluation by

way of policy and practice, solely or as a substantially contributing factor on account of

their alleged perceived historical or even actual mental disability);  and (3) declaratory

and injunctive relief preventing the use of physical force and restraint as a matter of

routine used by police and/or emergency personnel during their response to such "911"

calls as are at issue in this complaint (as in any of their work undue force and

restraint should be prohibited), and (4)  training of all Defendants to ensure that they

do not discredit truthful statements on account of bias or unwarranted assumptions

concerning the credibility of statements by persons such as in this case Plaintiff as to

the circumstances of their own life, history, or the events or any other factor relied on

to make decisions to restrict their liberty (for a few hours, a few days, or longer), by

non-judicial personnel such as the police and emergency services personnel and

physicians and nurses in this litigation (who declined to confirm that Plaintiff had

been participating in a conference call, and who did not credit her own statements

about the layout of her abode based solely on assumptions about her credibility in turn based solely on her disability status or perceived or alleged disability status), and (5) such other and further elements of a consent decree that would be fashioned by a court or commission (if on agreement) to benefit Plaintiff and the wider public as to whose resources there is waste as well as who may be at risk and on information and belief others are at risk and do experience unwarranted forced transfer to the Defendant Hospital's and to other hospital emergency rooms based on "911" calls throughout New York City; -- or in Plaintiff's case as would occur if the Defendant Hospital was on "diversion" (emergency rooms considered at capacity and unable to take more patients ordinarily transported there as the closest location; or as might occur without the injunctive and declaratory relief sought here and other appropriate relief, if Plaintiff were to be found at a location other than her residence but subjected to the same practices of the City Defendants (as other hospitals in New York City unaffiliated with Defendant Hospital or not owned by it do not, on information and belief do not employ the strip-search policy and practice – and most particularly not in a form that requires the patient to be in view while removing clothing and to strip down to underwear and/or remove underwear -- in use at the Defendant Hospital in its adult emergency rooms and in less codified form in its medical-surgical wards, and on information and belief also its inpatient psychiatric ward(s)).

Financial Damages:

Plaintiff seeks damages from the city-associated Defendants of $1 million for violation of her constitutional liberty interests, use of excessive force and undue restraint, used, among the other claims making such an award reasonable also in light

39

of other litigants having made such claims and receiving large awards with less compelling factual patterns than here.

Plaintiff seeks damages from the Hospital and Medical College Defendants of $3 million for violation of her right to accommodations and imposition of discriminatory policy and practice on account of alleged, perceived, or actual (or historical) disability status, in this incident, and for the fear of being treated under these same policies and practices to which the corporate Defendants (Hospital and Medical College) have already on information and belief claimed their ongoing commitment, including their strip search policy applied on account of disability status routinely but not to persons without such status or perceived or alleged status as routine practice by these Defendants (either or both of them), and for retaliation for complaints and efforts to litigate this claim without having filed, or having had any actual opportunity to file, a complaint with this particular incident.

I hereby affirm under penalty of perjury that the statements made herein are consistent with Rule 11's limitations and are believed to be true, and to be consistent with the Plaintiff's knowledge, the evidence in hand and is expected to be consistent with and additionally corroborated by any and all discovery.

Respectfully Submitted,

Louisa Smith

Louisa Smith

800 Fifth Avenue
New York, NY  10065
917-690-7016

June 8, 2015

40

occurred here on June 7, 2012). This policy and practice risks undue physical and emotional injury including traumatization, and degrades patients on account of alleged disability status (or history).

99. The policy and practice rests on assumptions that are unwarranted stereotypes about persons with psychiatric disabilities, and is in that sense doubly discriminatory.

100.    Plaintiff suffered unreasonable and undue loss of liberty and a variety of forms of serious harm as a result of the incidents precipitated but that should not under the circumstances been credited, by an anonymous caller to 911 services, or other emergency reporting method, and the removal of Plaintiff from a conference call in which she was engaged in her residence (that was being recorded with the knowledge and consent of all the participants), with the officer (on information and belief a detective-level police officer) taking her into custody in her residence after speaking with the person running the conference call and hearing that the call had been ongoing for about an hour and that despite a history of depression the Plaintiff was not believed to be doing anything untoward or unsafe during the call, and that the hope was to finish the call.

101.    The police officer was asked why she was being taken into custody and could not state why, just that someone had said it was necessary, and hung up the phone on the person with whom he had been speaking rather than even try to confirm her identity.

102.    The officer refused to allow Plaintiff to confirm through other means (doctors, etc. to be reached by phone if he wished), that she was not believed to need to be hospitalized or seen and there was no emergency.

103.    Plaintiff had been handcuffed as soon as she had agreed to open the door to hand her cordless phone to the police banging on her door and demanding to be let inside.  This was unnecessary force and restraint.  It was also deeply degrading as was the removal in view of a great number of people.

104.

Plaintiff was then at the Hospital facility retaliated against for her objection and litigation threat (and perceived strength of her assessment as a known former civil rights lawyer in the U.S. Justice Department lawyer with knowledge of applicable laws) to their policy of requiring her to remove all her garments including underwear in view of staff of Defendant Hospital and Defendant Medical College (both, on information and belief), prior to seeing a physician.

Plaintiff was also putatively disbelieved when she reported accurately as to what she had been doing when taken into custody (even if parens patriae in alleged purpose, still a loss of constitutionally protected liberty interests) and just before.  On information and belief the claimed disbelief of her statements was on account of discriminatory bias and/or retaliation (her claims of what she had been doing when the interruption occurred with arrival of emergency personnel and police at her residence and their restraining her and removing her to the Defendant Hospital as being the one closest of identified as being in a catchment area close by her residence).  In a further retaliatory move by Defendant New York Presbyterian Hospital, she was

kept in the emergency department for 36 to 38 hours, and then instead of being

released, based on an allegation that her claim she was not doing anything unusual

during the call (in which she was standing on her terrace and this was known to all

participants), and an alleged inability by the hospital doctor to see her balcony on

"google maps" satellite function, she was disbelieved in the first instance and sent for

further evaluation (which was at first identified as being at the Defendant Hospital's

own bed then she was instead placed elsewhere on information and belief to still

further lengthen the time she would lose liberty because the other facility did not

know her and would not receive her until between 2 and 4 a.m., on a weekend,

ensuring in effect that they would take days to evaluate her and her claims as they

had no knowledge whatever and had been told inaccurately by the Defendant Hospital

that Plaintiff had presented a danger to herself, which at the time of the incident was

most certainly documented as untrue and the allegations later stated were literally

physically impossible under the circumstances of the conference call in which Ms.

Smith participated and from where (and how, with what demeanor and activity) she

participated in it.   The allegations were also inconsistent with statements she had

just made the previous evening to someone in her residential building.

Indeed astonishing is that Plaintiff, who is a lawyer, was in the midst of a

conference call, when the conference was interrupted.

Plaintiff has had depressive conditions (so labeled) twice in her life, in fact

disabling her, but did not as a result of any mental illness or other medical condition

require emergency evaluation nor was there any reason whatever to credit the

anonymous caller – whose call on information and belief was little more than a minute

in length and from a location where the person could not possibly have seen any activity on the Plaintiff's balcony or terrace, and at any rate the wall is so high Ms. Smith could not have been doing anything other than participating in a the conference call as she was, with the phone in her hand at all times and no heavy breath, without harm to anyone including herself (and there is an imminence of harm requirement prior to taking someone into custody and depriving him or her of liberty, a loss of freedom with constitutional implications and violating constitutional rights).

<u>Notice of Claim Was Filed</u>

1. On or about Sept. 4, 2012, Plaintiff Louisa Smith filed a notice of claim as to the incident dated June 7, 2012, involving in the City of New York, its police department, and its emergency response system more generally.

2. Louisa Smith timely filed a Notice of Claim (within 90 days of the incident in question that commenced on June 7, 2012) filing papers with both (a) the City's Comptroller's Office  and with (b) the City's Corporation Counsel's office on the same date as the filing with the Comptroller's office; with each supplying a cover letter.

3. The claims made herein are timely under applicable federal law, and to the extent any state law claim is subject to a shorter timeline or incidents subsequent (and possibly any preceding),  the notice of claim also should be considered timely by relation of the incidents if established after discovery (i.e., if they are in fact related, as some do appear to be, though Plaintiff has identified where she has relied on reports rather than first-hand experience).

## Special Considerations
## (Factual and Legal Considerations Overlapping and Meriting Special Attention)

The loss of liberty involved by police taking a person into custody for "parens patriae" purposes is a constitutionally protected liberty interest that is of the most significant form that can be limited by state actors.   This significant decision and intervention should not be made lightly or on the insistence of an anonymous caller (or even someone who will self-identify if there are other countervailing circumstance and evidence), even with a person who has a history of a mental illness or a current mental illness (for these do not mean that the person is in need of urgent or emergency care or intervention).

Plaintiff is not arguing in this Complaint or seeking by filing it to have no response to legitimate emergency calls made by her or on her behalf; only that these calls be responded to when there is better indication that the call has a good basis and is NOT based on an anonymous call where she herself does not wish to have treatment and could if permitted present medical confirmation and/or connections to doctors to confirm her status medically known to them, OR where as here a corroborating person was telling officers that she had been speaking with Ms. Smith for an hour or more and indicated her belief there was no cause for concern, and was hung up on rather than called back or, if her own statements were not considered sufficient, Ms. Smith was not allowed to seek additional sources of support and proof that she did not need much less want any transport to hospital at the time of this incident (June 7, 2012) and/or is confirmed to have been made by her (on her own behalf; if confirmed that she

herself has made the call for help, she has no history of making undue use of emergency rooms or undue use of hospital treatment), particularly when she denies wanting any care and particularly where as here someone else testifies to having just been speaking with her, and the other circumstances are all inconsistent with the claim of any urgent demise or risk of demise by Plaintiff (who is also clearly no harm to anyone else, now or at any time in the past, and e.g., as her FBI background clearance reports show for employment for a sensitive position at USDOJ, which she left for personal reasons to join private firm in New York having worked in Washington DC for a period of time, and as she, e.g., has never been so much as arrested for civil disobedience or any other reason).

Furthermore, to place this heavy duty of becoming in effect clinicians officers is a great burden when their primary duty is law enforcement in the criminal law context.

Police officers should not have to be all things to all persons.  Police officers should not necessarily be asked to triage persons with allege mental illness as to whether there is a disability or either way, any emergency actually making it appropriate to limit the constitutional rights of an individual and remove him or her to a hospital (emergency room or other hospital facility).  This heavy responsibility should not be one borne by police alone based on nothing but a 911 call, which may be made by a person with malicious motives, as a prank or to cause harm (stigma, loss of time and money, reputational harm or reconsideration, prevention of completion of tasks and responsibilities the person may have, undue concern to neighbors as to whether the subject is ill or accused of a crime).  Alternatively, even a well-

intentioned caller may be mistaken and to remove a subject of a 911 caller to hospital is uncalled for (just as police themselves are not clinicians and should not be required to become such, though possibly some element of injunctive or consent decree relief might employ clinicians to respond to such calls, and to help determine whether to leave the subject of the call in his or her home).

Moreover, the number of calls made about a person having been more than one (e.g., given the subsequent incident in which Plaintiff was not found at home but allegedly entry was had to her home because an anonymous caller alleged she was in danger  and needed urgent help).  The same caller, if making a practice of such calls, should be discouraged (where such calls on information and belief are traced in some respect, even if someone may utilize multiple phones or phones not registered to him or her, a pattern may be obvious, and if so may even be a target for an injunction against him or her any such further calls).

Plaintiff's intention is not to seek primarily (or even necessarily at all) relief from individual persons, qua individuals in particular.

Claims of individual responsibility are realistic here if the facts show intentional bias, or sufficient reason to believe there was not just force but retaliation, *or failure* to follow any decent, constitutionally and otherwise legally acceptable policies and practices.

Police officers should not retaliate, including more specifically here for such things as the filing of the Notice of Claim, or for insistence on being permitted to file complaints or asking questions and objecting to how she was treated at times, or for evidence prominent publicly available and in her residence showing that Ms. Smith

does or did work previously at the U.S. Department of Justice's Civil Rights Division

in a section responsible in part with other sections for investigating and pursuing

claims of police misconduct (with several prominent consent decrees obtained from and

by that section of the Justice Department), whether or not they knew if she did work

on those consent decrees or believed she may have done so or did not like that she

elected to work in a section that did such work (even if her own work might turn out to

have had other topical focus).

One of the reasons for filing this Complaint, which Plaintiff has decided to do

for a variety of reasons having been concerned about retaliation, is to prevent further

retaliation or to have others take seriously that retaliation may be the cause of any

harm to her or her property (such as described above and alleged to be necessary to get

in to her apartment when she was not found at home to answer the door and let

anyone in, but where there is evidence that the main damage to the door was done

after the officers left the apartment after searching for her in the apartment, which

also implicates improper reasons for remaining in her apartment or even entering it to

begin with, potentially (this possibility should be incorporated as one of the issues for

discovery, or potential discovery in this action, and not solely the initial incident

involving the City as to which a Notice of Claim was ultimately filed timely,

preserving the federal claims under the usual statutes of limitations (and for the

federal claims all are timely by the straightforward application of law, while as to

other claims with shorter statutes of limitations concepts of equity, just as with

subsequent incidents sufficiently related to the incidents of June 7, 2012, should

arguably also be considered timely under the statutes of limitations, or equitable

principles of sufficient notice and relation back and relation forward of claims and amendments).

Even with training, which might be made more extensive and improved, as with other jurisdictions New York might well, particularly given crime and perhaps higher risk as a target for the particular form of security concern that is constituted by terrorism and the threat thereof (experienced so horribly in New York City on 9/11/01), **police officers in New York in particular as in other municipalities should have the resources of specialists when asked to respond to a "911" call** which should be expected **to reduce costs (overall) and undue interference with citizens and non-citizens acting in a lawful manner.**

Police officers may it appears also need more training on *when they do and do not have a reasonable concern about personal liability* -- which it should be noted many officers do appear to have, even though that concern is perhaps less serious than many officers should have (but alas do appear to have) if acting in good faith in connection with what they reasonably understand to be their jobs based on the training and supervision they have at the time (among other considerations).   The concern for personal liability may, if over-concern exists, result in undue interference with citizens in the context of incidents like that recounted on June 7, 2012, paradoxically.

The injunctive relief (or declaratory relief or consent decree suggested) as part of relief in this legal action, should involve serious consideration involving all or as many as possible stakeholders as is reasonable and workable.

34

<u>Harm</u>

As a result of the city's response to the 6/7/12 anonymous call and the

Defendant Hospital's conduct. Ms. Smith has sustained damages as described above,

and is fearful, rarely goes out, and the harm above and here has contributing to her

being is unable to recover her former full functioning, and worsening of a trauma

disorder and depression.

<u>Relief Requested</u>

On information and belief, the practices of both the Hospital and Medical

College Defendants and the City of New York (and its agencies and sub-entities and

contractors who are involved in the incidents and records of same), are ongoing.   In

particular, the strip search policy of the Defendant Hospital and Medical College

applied on account of perceived alleged  actual or historical mental disability continues

to apply to any person brought to the Hospital Defendant for any form of medical

treatment, and particularly though not exclusively in its emergency rooms (adult

regular, and psychiatric emergency rooms in particular though not necessarily

exclusively), and with a similar but less codified practice in use as applied to persons

on account of perceived, alleged, historical or actual mental disability hospitalized as

in-patients in its regular medical-surgical wards, and (on information and belief, for

Plaintiff has not been hospitalized as an in-patient in psychiatric wards operated by

Defendant Hospital or any entity owned by it, to her knowledge, yet on information

and belief considers that the same or analogous (similar) police and practice

permitting spot-check strip-searches applies in Defendant Hospital's own psychiatric

wards (such that if she had been transferred to one, in medical error or otherwise, she

would be and is at risk of being subjected to the strip-search policy and practice on

such wards operated by Defendant Hospital).

<u>Declaratory and Injunctive Relief</u>:

In light of ongoing risk of the same kind of incident recounted in this complaint,

Plaintiff seeks:

An order or consent decree directed to the City of New York and its agencies

and sub-entities and contractors with any involvement:  declaratory and injunctive

relief to allow for transfers in true emergencies, but to curtail improper transfers by

setting in place a system to ensure the appropriateness of transfers without relying

only a single "911" call by an anonymous source and without any further effort to

confirm actual necessity for transfer (particularly over the objection of the Plaintiff);

and to protect against undue force and excessive force, among other relief that should

be evaluated as part of the litigation and take into account procedures utilized with

some success to ensure that officers are not unduly fearful of personal liability for

leaving an individual in place after confirmatory steps, and/or to supply specialists to

assist in making such determinations without undue fear of personal liability –

without of course ruling out liability for conduct that is excessive and unjustifiable by

individual officers and/or persons retained to assist them as part of a process to ensure

that persons do not lose constitutional liberty where this is the result of improper

effort to have the subject (here, the Plaintiff in the action) removed whether from

malicious motivation or well-intentioned but mistaken motivation (because mental

illness alone does not constitute an emergency).  Thus, consistent with those purposes

and other reasonable concerns raised by the serious ongoing risk of loss of liberty and undue force with damage to Plaintiff:

(1) and order providing injunctive and declaratory relief, that inter alia finds that the City and the Defendant Hospital and Medical College violate not merely state law but Federal Constitutional law (Fifteenth and Fourth Amendments included), and the following federal statutes: the Americans with Disabilities Act, and the Rehabilitation Act, and that further would to provide as injunctive and declaratory relief as part of the order to prevent such violations going forward as to Plaintiff and in the public interest (it being wasteful of public resources otherwise, and not solely a question of harm to Plaintiff herself or others similarly treated on account of alleged actual perceived or historical mental/psychiatric disability):: potential appointment of a special master or committee to ensure that in the public interest as well as Plaintiff's own, resources are not misused and are however properly used (so that she may receive emergency care when appropriate but not be subjected to it over her objection when not confirmed to be appropriate with sufficient sources), and that the first and second forms of declaratory and injunctive relief may also appropriately include the Hospital Defendant and Medical College Defendant (or others to be identified), to ensure that bias as to rationale for transfer does not result either in strip-searches or disbelief (lack of crediting and confirmation) of the claims of the Plaintiff as to what she was doing or the lay-out of her own abode at the time of transfer and alleged emergency as occurred and she was not credited when she was transferred though she had been engaged in a recorded and later transcribed official court conference at the time of the arrival and intervention by police and emergency services personnel, and

37

during the apparent time of the telephone call to "911" by a person who gave no full

name and whose alleged or claimed reason for 911 (emergency services and/or police)

to dispatch police and an ambulance (and any other city personnel) to the residence of

the Plaintiff; and (2) declaratory and injunctive relief directed to the Defendant

Hospital and Medical College to require either or both as sufficient to ensure they

cease and desist from requiring disrobement on a alleged claim that the person in

question has a psychiatric or other mental disability -- as to Plaintiff and any other

person on account of such disability (alleged perceive actual or historical) brought to

their psychiatric emergency room (or any other location where the person is subjected

to disrobement fully including underwear, prior to seeing a physician for evaluation by

way of policy and practice, solely or as a substantially contributing factor on account of

their alleged perceived historical or even actual mental disability);  and (3) declaratory

and injunctive relief preventing the use of physical force and restraint as a matter of

routine used by police and/or emergency personnel during their response to such "911"

calls as are at issue in this complaint (as in any of their work undue force and

restraint should be prohibited), and (4)  training of all Defendants to ensure that they

do not discredit truthful statements on account of bias or unwarranted assumptions

concerning the credibility of statements by persons such as in this case Plaintiff as to

the circumstances of their own life, history, or the events or any other factor relied on

to make decisions to restrict their liberty (for a few hours, a few days, or longer), by

non-judicial personnel such as the police and emergency services personnel and

physicians and nurses in this litigation (who declined to confirm that Plaintiff had

been participating in a conference call, and who did not credit her own statements

38

about the layout of her abode based solely on assumptions about her credibility in turn

based solely on her disability status or perceived or alleged disability status), and (5)

such other and further elements of a consent decree that would be fashioned by a court

or commission (if on agreement) to benefit Plaintiff and the wider public as to whose

resources there is waste as well as who may be at risk and on information and belief

others are at risk and do experience unwarranted forced transfer to the Defendant

Hospital's and to other hospital emergency rooms based on "911" calls throughout New

York City; -- or in Plaintiff's case as would occur if the Defendant Hospital was on

"diversion" (emergency rooms considered at capacity and unable to take more patients

ordinarily transported there as the closest location; or as might occur without the

injunctive and declaratory relief sought here and other appropriate relief, if Plaintiff

were to be found at a location other than her residence but subjected to the same

practices <u>of the City Defendants (</u>as other hospitals in New York City unaffiliated with

Defendant Hospital or not owned by it do not, on information and belief do not employ

the strip-search policy and practice – and most particularly not in a form that requires

the patient to be in view while removing clothing and to strip down to underwear

and/or remove underwear -- in use at the Defendant Hospital in its adult emergency

rooms and in less codified form in its medical-surgical wards, and on information and

belief also its inpatient psychiatric ward(s)).

<u>Financial Damages:</u>

Plaintiff seeks damages from the city-associated Defendants of $1 million for

violation of her constitutional liberty interests, use of excessive force and undue

restraint, used, among the other claims making such an award reasonable also in light

of other litigants having made such claims and receiving large awards with less compelling factual patterns than here.

Plaintiff seeks damages from the Hospital and Medical College Defendants of $3 million for violation of her right to accommodations and imposition of discriminatory policy and practice on account of alleged, perceived, or actual (or historical) disability status, in this incident, and for the fear of being treated under these same policies and practices to which the corporate Defendants (Hospital and Medical College) have already on information and belief claimed their ongoing commitment, including their strip search policy applied on account of disability status routinely but not to persons without such status or perceived or alleged status as routine practice by these Defendants (either or both of them), and for retaliation for complaints and efforts to litigate this claim without having filed, or having had any actual opportunity to file, a complaint with this particular incident.

I hereby affirm under penalty of perjury that the statements made herein are consistent with Rule 11's limitations and are believed to be true, and to be consistent with the Plaintiff's knowledge, the evidence in hand and is expected to be consistent with and additionally corroborated by any and all discovery.

Respectfully Submitted,

Louisa Smith

Louisa Smith

800 Fifth Avenue
New York, NY  10065
917-690-7016

June 8, 2015

40